UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                              Case No. 8:07-bk-09727-MGW
                                                    Chapter 7
Misty D. Ralston and
Kevin C. Ralston,

        Debtors.
_____/

**MEMORANDUM OPINION AND ORDER**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

The Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA")

added 11 U.S.C. § 707(b)(1)-(2) (2008) ("the Means Test") to Chapter 7 of the

Bankruptcy Code.[1]  The Means Test is a formula for determining the amount of

disposable income a Chapter 7 debtor could hypothetically contribute to a Chapter 13

plan.  If the amount rises above a certain threshold, a presumption of abuse arises and the

case must be dismissed or converted to Chapter 13.  The Means Test is only applied to

debtors whose income is above their state's median income for a family of the same size

and whose debts are primarily consumer debts.  The Means Test applies to the Debtors in

this case, who "pass" the test under their own calculation.  The United States Trustee has

moved to dismiss the case, arguing that two of the expense deductions taken by the

Debtors in this case are not permissible.  If those two deductions are disallowed, the

Debtors "fail" the Means Test and the case must be dismissed or converted to a case

under Chapter 13.

Under the Means Test, a debtor is allowed to deduct payments "scheduled as

contractually due" on account of secured debts.  § 707(b)(2)(A)(iii) ("Secured Debt

_____

[1] All references to "§" and "Section" refer to Title 11 of the United States Code unless otherwise specified.

Deduction").  A question that has often arisen as courts attempt to interpret the Means

Test, which has also arisen in this case, is whether such payments may be deducted in a

Means Test calculation where, as here, the Debtors intend to surrender the collateral.  A

debtor is also allowed to deduct a monthly vehicle "Ownership Costs" amount pursuant

to the Internal Revenue Service ("IRS") Local Standards.  § 707(b)(2)(A)(ii)(I)

("Ownership Costs Deduction").  The second question that has arisen in this case is

whether these Debtors may deduct Ownership Costs where there is no monthly lease or

loan payment on account of the vehicle.  For the reasons stated herein, the Court

concludes that these Debtors may include both the Secured Debt Deduction and the

Ownership Costs Deduction in their Means Test calculation.

## I.   Factual Background

The pertinent facts in this case are relatively straightforward.  At the time of

filing, the Debtors owned a home that was encumbered by a mortgage obligating them to

make monthly payments of $2,235.31 and a 1987 pickup truck with 117,000 miles, which

was owned free and clear of any debt.  The Debtors' Statement of Intention indicates that

they intend to surrender their home.  (Chapter 7 Individual Debtor's Statement of

Intention, Doc. No. 1.)  The Debtors' annualized current monthly income is above the

median income for a family of four in the state of Florida, so they were required to fill

out the entirety of Official Form 22A, the Means Test form (Chapter 7 Statement of

Current Monthly Income and Means-Test Calculation, Doc. No. 1) ("Form 22A").  On

Form 22A, the Debtors included in their Secured Debt Deduction the $2,235.31 monthly

mortgage payments on their home and included an Ownership Costs Deduction of

$332.00 for their 1987 pickup, which is owned free and clear.  As a result of taking these

deductions, the Debtors calculated their monthly disposable income as a *negative* $819.39.  The U.S. Trustee filed a motion to dismiss pursuant to § 707(b)(2), or, alternatively, § 707(b)(3) (Doc. No. 17) ("Motion to Dismiss").  The U.S. Trustee argues that these two deductions are improper.

If the Debtors were not allowed to deduct their monthly mortgage payments on the home that they intended to surrender, but instead were allowed to deduct only the IRS Local Standards amount for housing and utilities, which is $906.00, their deductions would be reduced by $1,329.31.  If they were not allowed the Ownership Costs Deduction for their 1987 pickup truck, which is unencumbered, their deductions would be further reduced by $332.00.  As a result of disallowing these two deductions, the Debtors' monthly disposable income, instead of being a *negative* $819.39 would be a *positive* $841.92.  Multiplied by 60, this would amount to $50,515.20 that they could pay to their unsecured creditors.[2]  With that amount of disposable income, these Debtors would "fail" the Means Test, and the presumption of abuse would arise.

If this Court finds that the Debtors may take these deductions, resulting in the Debtors passing the Means Test, the U.S. Trustee alternatively argues that their case should be dismissed as abusive pursuant to § 707(b)(3), under a totality of the circumstances analysis, arguing that the totality of the Debtors' financial situation demonstrates abuse.  The Debtors and the U.S. Trustee have filed cross-motions for summary judgment (Doc. No. 26; Doc. No. 27) on the Motion to Dismiss.

---

[2] The numbers calculated by the U.S. Trustee are slightly different from the Court's calculation.  The U.S. Trustee has added a hypothetical Chapter 13 administrative expense and made a couple additional minor adjustments to the Debtors' numbers, including allowing a $200 deduction for an older vehicle based on the Internal Revenue Manual instructions.  The U.S. Trustee calculates that the Debtors would have $551.05 monthly disposable income and $33,063.00 total during the life of a Chapter 13 plan.  (*See* Notice of Filing Exhibits to the U.S. Trustee's Motion to Dismiss, Doc. No. 18, Ex. 2.)

## II.  Legal Analysis

This Court has jurisdiction under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(2)(A) and (O).

### A.  Summary Judgment Standard

Federal Rules of Bankruptcy Procedure 7056 and 9014 make Federal Rule of Civil Procedure 56, which provides for summary judgment, applicable to adversary proceedings and contested matters within the context of a bankruptcy case.  The contested matter before the Court is the U.S. Trustee's Motion to Dismiss.  The parties have filed cross-motions for summary judgment on the Motion to Dismiss.  It is appropriate for a court to grant summary judgment where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Johnson v. Board of Regents of the Univ. of Ga.*, 263 F.3d 1234, 1242 (11th Cir. 2001).  For purposes of granting a motion for summary judgment, all evidence and all actual inferences must be viewed "in the light most favorable to the party opposing the motion."  *Johnson*, 263 F.3d at 1243.

In this case, there is no genuine disagreement between the parties as to the material facts that underlie the dispute as to whether the Debtors "fail" or "pass" the Means Test.  Their dispute relates to the application of BAPCPA to the undisputed facts of this case.  Therefore, summary judgment is appropriate as to the question of whether the Debtors in this case pass or fail the Means Test.  However, as the parties represented prior to the hearing on summary judgment, there is substantial disagreement as to the facts that might or might not support dismissal with respect to the U.S. Trustee's alternative argument under § 707(b)(3).  Where the record exhibits such factual

disagreements, summary judgment must be denied and the matter be set for trial. *Clemons v. Dougherty County, Ga.*, 684 F.2d 1365, 1369 (11th Cir. 1982). Therefore, the Court will only address the Means Test issues. Because the Court decides these issues in the Debtors' favor, it will be necessary to set for final evidentiary hearing the question of whether the case should be dismissed pursuant to § 707(b)(3).

### B.  The Means Test

Under the Means Test, a debtor's monthly disposable income is calculated by taking the debtor's current monthly income, as defined in § 101(10A) ("CMI"), and subtracting the allowable monthly expenses delineated in § 707(b)(2), consisting of the following five categories: 1) applicable monthly expense amounts specified under the IRS National Standards and Local Standards, 2) actual monthly expenses for the categories listed in the IRS Other Necessary Expenses, 3) various specified actual expenses (e.g., costs to maintain the safety of the family from domestic violence; for care of an elderly, chronically ill, or disabled family member; educational expenses for dependent children; increased home energy costs), 4) monthly payments contractually due on secured debts, and 5) monthly payments on priority claims. 11 U.S.C. § 707(b)(2)(A)(ii)-(iv). If, after subtracting the allowable monthly expenses from the debtor's CMI, the amount of monthly disposable income, multiplied by 60, is greater than $10,950, then the debtor "fails" the Means Test. If the amount is less than $6,575, then the debtor "passes" the Means Test. If the amount is between $6,575 and $10,950,[3] the debtor only fails the Means Test if the amount is greater than 25% of the debtor's non-priority unsecured claims. If the debtor fails the Means Test, absent a showing of special

---

[3] This number is regularly adjusted to comport with inflation.

circumstances, which have not been alleged in this case, the court "shall presume abuse exists" and the case must be either dismissed or converted to a case under Chapter 13.

### C.  Scheduled as Contractually Due

The Means Test has been the fodder for an inordinate number of written opinions over the course of the last three years.  The first question in this case, whether secured debt payments may be deducted where the collateral will be surrendered, is itself responsible for a large number of the Means Test opinions.  While a majority position is gradually emerging, to date, none of the courts of appeals have weighed in on this issue. The two bankruptcy appellate panels that have decided the issue have followed the emerging majority, holding that payments on account of secured debt may be deducted regardless of an intent to surrender the property.  *In re Rudler*, 388 B.R. 433 (B.A.P. 1st Cir. 2008) (Chapter 7 case); *In re Thomas*, 395 B.R. 914 (B.A.P. 6th Cir. 2008) (holding that the means test applies in the same mechanical manner in a Chapter 13 case).

Two courts in the Middle District of Florida have addressed the question of whether the Secured Debt Deduction is allowed under the Means Test where the collateral will be surrendered, but only in the context of applying the Means Test deductions in a Chapter 13 case.  First, Judge Paskay, in *In re Vernon*, 385 B.R. 342 (Bankr. M.D. Fla. 2008), held that the debtors cannot deduct the monthly secured debt payments on collateral that is to be surrendered under a Chapter 13 plan.  However, the court specifically noted that the result might be different in a Chapter 7 context.  "[T]he Debtor's arguments for allowing deductions even when collateral is surrendered post-petition may be appropriate within the context of a Chapter 7 case where the court is determining whether the filing is an abuse of the Code through the means test, but are

inapplicable in situations concerning 11 U.S.C. § 1325 due to the different policy goals of Chapter 13." *Id.* at 347. The court noted that using a "means test as a blunt measure of ability to pay" in the context of confirming a Chapter 13 plan, but without regard to a Chapter 13 plan that does not provide for such payments, "would lead to results that are illogical and sometimes produce a strange result." *Id.*

Several weeks after the case of *In re Vernon* was decided, Judge Funk issued an opinion in *In re Holmes*, 395 B.R. 149 (Bankr. M.D. Fla. 2008), in which he similarly held that a debtor could not deduct from her monthly income payments on a second mortgage that had been stripped and deemed entirely unsecured during the case. The court declared that the "'snapshot' approach" is "directly at odds with § 1325(b)(1)(B)[,] which requires a debtor to fund a plan with all of his or her disposable income." *Id.* at 152. Further, "it would go against the very essence of Chapter 13 to allow a debtor to deduct an expense that is non-existent at the time of confirmation." *Id.* at 153. This Court agrees with this interpretation of the Means Test as applied in a Chapter 13 case. Chapter 13 is a living chapter, constantly changing and evolving. Throughout the life of a Chapter 13 plan, it may be and often is amended to reflect a change in the debtor's circumstances. Therefore, it would be inapposite to apply the Means Test as it is partially incorporated into Chapter 13 in the same rigid manner as it is meant to apply in Chapter 7. *See In re Kalata*, No. 07-21710, 2008 WL 552856, at *5 (Bankr. E.D. Wis. Feb. 27, 2008); *In re Arsenault*, 370 B.R. 845 (Bankr. M.D. Fla. 2007) (holding that in a Chapter 13, where the Debtor's actual income is different from the amount calculated under § 101(10A), the actual amount should be taken into account when determining the amount that must be devoted to payments to unsecured creditors under the plan). No judges in

the Middle District of Florida have issued opinions on the question of whether a debtor

may claim the Secured Debt Deduction where the collateral is to be surrendered in the

context of a Chapter 7 case.

While the Middle District has remained silent, the Southern District of Florida has

issued three opinions, all of which hold that when applying the means test to a Chapter 7

debtor, a deduction of monthly secured debt payments is allowed even if the collateral

will be surrendered in the bankruptcy case.  *In re Benedetti*, 372 B.R. 90 (Bankr. S.D.

Fla. 2007) (Cristol, J.); *In re Parada*, 391 B.R. 492 (Bankr. S.D. Fla. 2008) (Isicoff, J.);

*In re Castillo*, No. 08-10878, 2008 WL 4544467 (Bankr. S.D. Fla. Oct. 10, 2008)

(Hyman, C.J.).  For the reasons stated below, this Court will follow its colleagues in the

Southern District and what it believes to be the growing majority position and hold that in

the context of determining whether a Chapter 7 filing is to be presumed abusive, the

Means Test allows a debtor to claim the Secured Debt Deduction without regard to

whether the collateral will be retained or surrendered.

### 1. *Plain Meaning of the Statute*

Statutory interpretation must always begin with the language of the statute itself.

As the Supreme Court has instructed, "when the statute's language is plain, the sole

function of the courts—at least where the disposition required by the text is not absurd—

is to enforce it according to its terms."  *Hartford Underwriters Ins. Co. v. Union Planters

Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947, 147 L. Ed. 2d 1 (2000) (citation

omitted).  However, the specific language of a statute must be read in context.  "In

interpreting one part of a statute, we must not be guided by a single sentence or member

of a sentence, but look to the provisions of the whole law, and to its object and policy."

*In re Welzel*, 275 F.3d 1308, 1317 (11th Cir. 2001) (citation omitted).  Where the words

in the statute are not defined terms, the court should look to their ordinary, dictionary-

defined meaning.  *Consolidated Bank, N.A. v. U.S. Dep't of the Treasury*, 118 F.3d 1461,

1464 (11th Cir. 1997) ("In the absence of a statutory definition of a term, we look to the

common usage of words for their meaning.").  The statutory provision providing the

Secured Debt Deduction reads, in relevant part, as follows:

> (iii) The debtor's average monthly payments on account of secured debts
> shall be calculated as the sum of—
> > (I) the total of all amounts *scheduled as contractually due* to
> > secured creditors in each month of the 60 months following the date of
> > the petition; . . .
>
> divided by 60.

11 U.S.C. § 707(b)(2)(A)(iii) (2007) (emphasis added).  The amount that results from this

calculation is deducted from the debtor's current monthly income in determining the

debtor's disposable monthly income.  *Id*. § 707(b)(2)(A)(i).

Almost every court that has addressed this statute has determined that it is not

ambiguous.  *See, e.g.*, *In re Randle*, No. 07-631, 2007 WL 2668727, at *3, *7 (N.D. Ill.

July 20, 2007); *In re Turne*r, 384 B.R. 537, 540-42 (Bankr. S.D. Ind. 2008).  However, at

least one court has broken from the crowd and determined that the statute is ambiguous,

noting that "[t]he strained linguistic arguments of both the majority and minority camps

to identify the 'plain meaning' of the phrase readily identify the ambiguity."  *In re Smale*,

390 B.R. 111, 115 (Bankr. D. Del. 2008) (applying the interpretive principle of *noscita a*

*sociis* (a word is known by the company it keeps)); *see also In re Palm*, 2007 WL

1772174, *2 (Bankr. D. Kan. June 19, 2007) (noting that there are many places in

BAPCPA where " the plain meaning of the statute is not easily discerned, with at least

two, and often times more, plain meanings appearing to different readers.").  While

acknowledging the wide-ranging split between courts across the country on the "plain meaning" of this provision, it is this Court's conclusion that the statute's language is plain. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536, 124 S. Ct. 1023, 1031, 157 L. Ed. 2d 1024 (2004) (indicating a preference for finding the plain meaning of a statute in order to "avoid the pitfalls that plague too quick a turn to the more controversial realm of legislative history").  Those courts who find a different "plain meaning" only do so by looking outside the confines of the statutory provision.

Several courts in the minority camp have held that the term "scheduled as" should be assigned a "bankruptcy-specific" meaning, as referencing items listed on the debtor's bankruptcy schedules and statements, including the statement of intention.  *In re Burden*, 380 B.R. 194, 200-01 (Bankr. W.D. Mo. 2007); *In re Ray*, 362 B.R. 680, 685 (Bankr. D.S.C. 2007) ("It therefore seems that the better construction of 'scheduled as contractually due' would consider the debtors' intention to surrender the collateral and make no future payments to the creditor."); *In re Skaggs*, 349 B.R. 594, 599 (Bankr. E.D. Mo. 2006).  The analysis presented by these courts has not held up to scrutiny, however. The court in *In re Nockerts* performed its own search of the Bankruptcy Code to determine whether "scheduled as" was a phrase only used in reference to the debtor's schedules.  357 B.R. 497, 502-03 (Bankr. E.D. Wis. 2006).  The court found several instances where a variation of the phrase was used in the Bankruptcy Code, and discovered that when the phrase referred to the debtor's bankruptcy schedules, the reference was crystal clear.  *Id*. (for example, "neither listed nor scheduled under section 521(1)," in § 523(a)(3), and "scheduled under section 521(1)," in § 554(c)).  Elsewhere in the Code, a similar phrase was used to refer to scheduled payments.  *Id*. (for example,

"describing the repayment schedule . . . of payments scheduled to repay the debts reaffirmed," in § 524(k)(3)(H)(ii)).  Because no specific reference is made to the debtor's bankruptcy schedules in § 707(b)(2), the phrase "scheduled as contractually due to secured creditors" should not artificially be given a bankruptcy-specific meaning.  *Id.*

Additionally, there is also no bankruptcy schedule on which the debtor is instructed to list "payments scheduled as contractually due to secured creditors."  *See In re Randle*, 2007 WL 2668727, at *6.  The only place where "payments contractually due to secured creditors in the 60 months following the date of the petition" must be listed is on Form 22A.  However, not only is Form 22A a "statement" and not a "schedule," *see In re Castillo*, 2008 WL 4544467, at *2 (reasoning that the "Statement of Intention cannot be morphed into the 'Schedules'") (citation omitted), but it is merely an implementation of the statutory provision.  An official form cannot change the meaning of a statute.  *See* Fed. R. Bankr. P. 9009; *see In re Rahman*, -- B.R. --, --, 2009 WL 205013, *7 n.10 (Bankr. E.D.N.Y. Jan. 23, 2009).

The First Circuit Bankruptcy Appellate Panel has adopted *Nockerts*' statutory interpretation of the language of § 707(b)(2).  *In re Rudler*, 388 B.R. at 438 ("We disagree with *Skaggs*, because as the court in *In re Nockerts* pointed out, the *Skaggs* exercise in statutory analysis actually compels the opposite conclusion.").  This Court joins *Nockerts* and *Rudler* in holding that, for the reasons stated above, the phrase "scheduled as" should be given its plain meaning, referring merely to scheduled payments, and should not be artificially assigned a special, bankruptcy-specific meaning where that result is not compelled by the plain meaning of the statute.

Therefore, since the phrase "payments scheduled as contractually due" must be given its ordinary meaning, it is appropriate to refer to the dictionary definition.  *See United States v. McNab*, 331 F.3d 1228, 1237 (11th Cir. 2003), *cert. denied*, 540 U.S. 1177 (2004) ("[T]o determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance.") (citation omitted).  One dictionary definition of "to schedule" or "scheduled" is "1 to place or include in a schedule  2 to make a schedule of  3 to plan for a certain time."  *Webster's New College Dictionary* 1281 (Michael Agnes, ed. 2007).  The word "contractual" or "contractually" means "of, or having the nature of, a contract."  *Id*. at 316.  Therefore, "payments scheduled as contractually due" are "planned" payments that are scheduled to be due pursuant to a contract.

The phrase "scheduled as contractually due" is followed by the phrase "in each of the 60 months following the date of the petition."  § 707(b)(2)(A)(iii)(I).  Some courts argue that the second phrase implicates a forward-looking analysis—that payments must actually be due in each of the 60 months following the date of the petition to be allowed as a deduction.  *See In re Naut*, No. 07-20280, 2008 WL 191297, at *9 (Bankr. E.D. Pa. Jan. 22, 2008); *see also In re Love*, 350 B.R. 611, 614 (Bankr. M.D. Ala. 2006) (arguing that "'scheduled' payments" indicates "a forecast of future events and not historic data").  This Court disagrees with that interpretation.  At the end of the provision is the following: "divided by 60."  § 707(b)(2)(A)(iii).  These provisions do not change the plain meaning of the statute as a snapshot of a debtor's contractual secured debt obligations on the date of the petition.  *See Fokkena v. Hartwick*, 373 B.R. 645, 656 (D. Minn. 2007).  Taken together, the meaning behind these provisions is rather that the debtor will only be

allowed to deduct monthly an amount equal to the total of such payments on secured debt due during the 60 months following the date of the petition, divided by 60. *See* § 707(b)(2)(A)(iii). If the debtor has less than 60 months of payments due on the secured debt, the amount to be deducted will be less than the total amount of the monthly payment. For example, if the debtor has a monthly secured debt payment of $600, but only 10 payments left, the allowed deduction will be the total of those payments, or $6,000, divided by 60. Thus, the debtor would only be allowed a $100 monthly deduction on account of secured debt under this provision, despite the fact that the actual monthly payment is $600.

     2. *Legal Effect of Surrender*

     As many courts have noted, a payment is contractually due on the petition date regardless of whether the debtor intends to reaffirm the debt or surrender the collateral. *In re Nockerts*, 357 B.R. at 500 (noting that "nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due"); *In re Walker*, No. 05-15010, 2006 WL 1314125, at *4 (Bankr. N.D. Ga. May 1, 2006) (noting that even the "surrender of the collateral does not change the fact that the payments are 'contractually due'"); *In re Randle*, 2007 WL 2668727, at * 7 ("The debtor's announced intent to surrender the property does not change the contractual obligation owed by the debtor.").

     The debtor's contractual obligation may be extinguished at some point in the process, but it is not extinguished upon the filing of a Statement of Intention indicating an intent to surrender. *See In re Randle*, 2007 WL 2668727, at *7 (noting that "the 'Statement of Intention' filed at the time of the petition is not a self-executing document, that when filed, automatically extinguishes a contract"). Even after the collateral has

been surrendered, sold, and the proceeds applied to the obligation, an unsecured

deficiency claim will likely remain, based on the debtor's liability under the contract. *See*

*also In re Quigley*, 391 B.R. 294, 302 (Bankr. N.D. W. Va. 2008) ("discharge . . . only

makes the pre-petition contractual obligation unenforceable as a personal liability of the

debtor; the underlying debt is not extinguished and it continues to exist"); *In re Walker*,

2006 WL 1314125, at *4 ("The debtor's contractual liability for the debt is not eliminated

upon the surrender of the collateral.  At the earliest, it may be eliminated by the entry of

the discharge.  At the latest, the contractual obligation may never actually be eliminated,

but instead, the creditor would merely be enjoined from collecting the debt from the

debtor *in personam*.").

Several courts have noted that the surrender of collateral, while it may not

eliminate the debt entirely, does eliminate the secured portion of the debt.  *In re Harris*,

353 B.R. 304, 309 (Bankr. E.D. Okla. 2006); *In re Love*, 350 B.R. at 614.   However,

because having the intent to surrender property on the petition date, in itself, does not

have any legal effect on the nature of the debt, *In re Randle*, 2007 WL 2668727, at *7, in

order to take into account the subsequent surrender of the collateral, the Court would

have to take post-petition events into consideration.  *See In re Walker*, 2006 WL

1314125, at *5.

3.   *The Chapter 7 Means Test is a Snapshot*

As noted above, when interpreting one provision of a statute, that provision

should be considered in context, and the court should "look to the provisions of the whole

law, and to its object and policy."  *In re Welzel*, 275 F.3d at 1317 (citation omitted).  The

Means Test, as a whole, as it is applied in a Chapter 7 case, has the character of a

mechanical formula that often relates very little to the actual financial circumstances of the debtor. *In re Parada*, 391 B.R. at 497 ("[T]he means test is a mechanical test, based only superficially on a debtor's reality, the purpose of which is to create a bright line presumptive test of eligibility."). The amount of income is based on a historical formula, *see* § 101(10A), and the bulk of the allowable deductions are fixed amounts, based upon the IRS National Standards and Local Standards, not based on a debtor's actual expenses, *see* § 707(b)(2)(A)(ii)(I).

As the function of the Means Test is to be a mechanical formula for establishing a presumptive bar to obtaining relief in a Chapter 7 case, it is fitting that the deductions should be bright line measurements. *See In re Thomas*, 395 B.R. at 919-20. Otherwise, courts would have to consider the facts and circumstances of each case, including post-petition events, such as the surrender of collateral, when conducting a Means Test analysis under Chapter 7. *See In re Benedetti*, 372 B.R. at 96-97 (holding that the Means Test involves an "evaluation of the Debtor's financial condition on the petition date"). Requiring the court to inquire in every case "into each debtor's intent and individual circumstances . . . would be at odds with Congress's purpose of creating a mechanical means test." *Fokkena v. Hartwick*, 373 B.R. at 655-56. This Court agrees that in a Chapter 7 case, "the means test calculations are intended to represent a 'snapshot' as of the petition date, examined without regard to a debtor's future intentions." *In re Smale*, 390 B.R. at 115.

Some courts have stressed that the primary purpose of Congress in enacting the Means Test was to insure that those debtors who could afford to pay their creditors be required to do so. *See In re Skaggs*, 349 B.R. at 600 ("A primary intent of Congress in

the passage of BAPCPA was to ensure that those debtors who can pay their debts do so.").  Allowing debtors to deduct from their CMI a payment that they will not in fact be making appears to run counter to that purpose.  *See In re Burden*, 380 B.R. at 204.  However, for the reasons stated above, it appears that is the result required by the plain language of the statute.  Moreover, the Means Test must be considered in context.  Even if a debtor "passes" the Means Test, the Court still may order the dismissal or conversion of a Chapter 7 case under § 707(b)(3).  The Means Test is a bright line in the sand, not the final word on dismissal.

Therefore, under the plain meaning of this statutory provision and considering the Means Test as a whole, this Court holds that the "average monthly payments on account of secured debt" includes all payments that the debtor was obligated to make during the 60 months following the date of the petition, regardless of whether a debtor also intends to surrender the property securing the debt.

### D.  Applicable Monthly Expenses

The Debtors in this case have subtracted, as an "applicable monthly expense amount specified under the National Standards and Local Standards," the IRS Local Standards Ownership Costs Deduction for the Debtors' second vehicle, a 1987 pickup truck, which is owned free and clear.  The Means Test provision in question reads as follows:

> (I)  The debtor's monthly expenses shall be the debtor's *applicable monthly expense amounts specified under the National Standards and Local Standards*, and the debtor's *actual* monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a

> dependent. . . . .  Notwithstanding any other provision of this clause, the monthly expenses of the debtor *shall not include any payments for debts*.

11 U.S.C. § 707(b)(2)(A)(ii)(I) (emphasis added).  The IRS National Standards and Local Standards (together, "IRS Standards") can be found on the IRS website.[4]  The U.S. Trustee website also posts the IRS Standards in effect for all dates since October 2005. Because the Debtors filed for Chapter 7 relief on October 17, 2007, they are entitled, under the "IRS Local Transportation Expense Standards" to "Ownership Costs" in the amount of $471 for a "First Car" and $332 for a "Second Car."[5]  This information is provided in the form of a chart.  There is no explanation or elaboration in the Local Standards as to when a taxpayer may take a particular deduction.

The question of interpretation in this case is whether the "applicable monthly expense amounts" include the Ownership Costs Deduction for a car that is owned outright, on which the debtors make no lease or loan payment.  Is the Ownership Costs deduction applicable if the debtor does not have a lease or loan payment?  Four bankruptcy appellate panels have addressed this issue, in the context of Chapter 13 cases, and they are evenly split.  The Tenth and Sixth Circuit Bankruptcy Appellate Panels have held that the debtor *may* take the deduction.  *See In re Pearson*, 390 B.R. 706 (B.A.P. 10th Cir. 2008), *vacated as moot by* 2009 WL 205408 (10th Cir. Jan. 22, 2009); *In re Kimbro*, 389 B.R. 518 (B.A.P. 6th Cir. 2008).  The Eighth and Ninth Circuit Bankruptcy Appellate Panels have held that the debtor may *not* take the deduction.  *See In re Wilson*, 383 B.R. 729 (B.A.P. 8th Cir. 2008); *In re Ransom*, 380 B.R. 799 (B.A.P. 9th Cir. 2007).

---

[4] Internal Revenue Service Website, Collection Financial Standards, at http://www.irs.gov/individuals/ article/0,,id=96543,00.html (last visited January 26, 2009).

[5] United States Trustee Website, IRS Local Transportation Expense Standards: South Census Region (Cases Filed Between October 15, 2007, and December 31, 2007, Inclusive), *at* http://www.usdoj.gov/ust/ eo/bapcpa/20071015/bci_data/IRS_ Trans_Exp_Stds_SO.htm (last visited January 26, 2009).

The Seventh Circuit recently became the first circuit court to consider the issue, holding that the debtor may take the deduction. *In re Ross-Tousey*, 549 F.3d 1148 (7th Cir. 2008). Only one court in Florida has ruled on this issue, also holding that the debtor can take the deduction. *In re Morgan*, 374 B.R. 353 (Bankr. S.D. Fla. 2007) (Cristol, J.). For the reasons stated below, this Court will follow the Seventh Circuit and will allow the Debtors to deduct, as an "applicable monthly expense amount," the Ownership Costs allowance for their 1987 pickup truck, which is owned outright.

Where the language of the statute is plain, the Court must enforce it according to its terms. *Hartford Underwriters*, 530 U.S. at 6, 120 S. Ct. at 1947. The question here is what is meant by the word "applicable" in this statute. Reference to the common, dictionary definition of the word may again be helpful in this case. One definition of "applicable" is "that can be applied; appropriate." *Webster's New College Dictionary* 68 (Michael Agnes, ed. 2007). It is also useful to note that the word "applicable" is used in contrast to the term "actual." The phrase "applicable monthly expense amounts" (which are determined under the IRS Standards) is followed by the phrase "actual monthly expense amounts" (which are determined under the IRS Other Necessary Expenses). Therefore, it is clear that the applicable monthly expense amounts are not a debtor's "actual" expenses, but rather "applicable" expenses to be determined by reference to the "National and Local Standards."

Many courts holding that debtors may not take the ownership costs expense for a car owned outright with no lease or loan payments rely heavily on the Internal Revenue Manual, which is an internal manual establishing the procedures for the Internal Revenue Service. *See, e.g.*, *In re Wilson*, 383 B.R. at 733 (noting that "[t]he bankruptcy court's

reading here is inconsistent with how the IRS applies its own standards"); *Fokkena v. Hartwick*, 373 B.R. at 650 (noting that "in order to determine whether the expense Standards issued by the IRS are 'applicable,' the most logical resource to consult is the IRS").   Under the Internal Revenue Manual, an internal revenue officer applies the Local Standards as caps on the taxpayer's expenses, not as set deductions.  *See Internal Revenue Manual, Part 5: Collecting Process, Chapter 15: Financial Analysis Handbook*, *available at* http://www.irs.gov/irm/part5/ch15s01.html) ("IRM").   Under the IRM, the National Standards, on the other hand, are not applied as caps; each taxpayer is allowed the total amount of those deductions.  *Id*.  The Ownership Costs expense is found in the Local Standards under "Transportation" and is applied under the IRM as a cap on the monthly lease or loan payment a taxpayer incurs on a vehicle.  If there is no car payment, the taxpayer is not entitled to the Ownership Costs deduction.  *Id*.; *see also Fokkena v. Hartwick*, 373 B.R. at 651.

There are several reasons why a court applying the Means Test to a debtor in bankruptcy should not apply the IRS Standards in the same way as they would be applied by an internal revenue officer under the IRM.   First, the way in which the IRM is applied to a taxpayer is at odds with the clear language of the statute.  The statute states that a debtor may deduct the "applicable" amounts specified under the Local Standards.  § 707(b)(2)(A)(ii)(I).  Because the term "applicable" is contrasted so neatly with the term "actual," at a minimum, it is clear that the IRS Standards amounts are not meant to be used as caps.  *See In re Fowler*, 349 B.R. 414, 418 (Bankr. D. Del. 2006) (noting that "[t]he use of 'actual' with respect to Other Necessary Expenses and 'applicable' with respect to the National and Local Standards must mean that Congress intended two

different applications."); *see also In re Pearson*, 390 B.R. at 413 (quoting *Duncan v. Walker*, 533 U.S. 167, 173, 121 S. Ct. 2120, 2125, 150 L. Ed. 2d 251 (2001), for the maxim of statutory construction that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

Further, the IRM gives broad discretion to internal revenue officers in determining the amount a taxpayer is allowed to deduct under the IRS Standards as expenses. *See In re Ross-Tousey*, 549 F.3d at 1159; *In re Kimbro*, 389 B.R. at 527-28. It is clear by review of the legislative history and by viewing § 707(b)(2) in its entirety that the Means Test is meant to be a mechanically applied formula, into which the bankruptcy judge should not insert his or her discretion. *In re Ross-Tousey*, 549 F.3d at 1159; *In re Ragle*, 395 B.R. 387, 400-01 (E.D. Ky. 2008). As stated aptly by the Sixth Circuit Bankruptcy Appellate Panel, "the process of applying the guidelines of the IRM for tax collection purposes is a highly discretionary process for a revenue officer. In reality, that process is much like the highly discretionary process that bankruptcy judges had utilized before the 2005 amendments to the bankruptcy code . . . ." *In re Kimbro*, 389 B.R. at 530 (also noting that "[t]he clear policies behind the means test were the uniform application of a bright-line test that eliminates judicial discretion. Plainly, Congress determined that these policies were more important than accuracy."). Unlike the IRS Standards, the IRM itself was not incorporated into the statute. Therefore it is not appropriate to refer to the IRM as an aid to statutory interpretation, especially where the IRM would compel a result

in direct contradiction to the plain meaning of the statute.  *See In re Pearson*, 390 B.R. at

714; *In re Ragle*, 395 B.R. at 397.

      Secondly, the legislative history of BAPCPA does not support the application of

the IRS Standards by reference to the IRM.  A prior version of the legislation that

ultimately resulted in BAPCPA included in its means test a specific reference to the IRM.

House Bill 3150, as introduced in the House of Representatives, read in part as follows:

> (3) 'Projected monthly net income' means current monthly total income
> less—
>     (A) the expense allowances under the applicable National
> Standards, Local Standards and Other Necessary Expenses allowance . . .
> as determined under the Internal Revenue Service financial analysis for
> expenses in effect as of the date of the order for relief; . . . .

Consumer Bankruptcy Reform Act of 1998 (Introduced in House), H.R. 3150.IH, § 101,

105th Congress (1998).  The legislation made its way through the House with this

provision generally intact. Consumer Bankruptcy Reform Act of 1998 (Engrossed as

Agreed to or Passed by House), H.R. 3150.EH, § 101, 105th Congress (1998) (the

relevant language being changed to "as determined by the Internal Revenue Service

allowance").  However, the version of House Bill 3150 that was agreed to by the Senate

had this language removed.  *See* Consumer Bankruptcy Reform Act of 1998 (Engrossed

as Agreed to or Passed by Senate), H.R. 3150.EAS, 105th Congress (1998).  Clearly,

BAPCPA as enacted does not in any way refer to the IRM, and that absence seems to

indicate that Congress did not, in its final enactment, intend to incorporate the IRM into

the § 707(b)(2) analysis.  The idea was raised and discarded during the legislative

process.  Therefore, it is not fitting for this Court to insert the IRM back into the Means

Test analysis.  *See In re Fowler*, 349 B.R. at 419 (citing *Transcontinental & Western Air,

Inc. v. Civil Aeronautics Board*, 336 U.S. 601, 605 n.6, 69 S. Ct. 756, 758 n.6, 93 L. Ed.

911 (1949), for the proposition that prior, unenacted legislation may be used to deduce Congressional intent); *see also In re Morgan*, 374 B.R. at 362.

If the Court is left with the plain language of the statute, and the IRS Standards standing alone without the interpretive aid of the IRM, it is clear that a debtor may deduct the "Ownership Costs" expense amount if that expense amount is "applicable" to the debtor.  The use of the term "Ownership Costs" alone, in the IRS Standards, does not lead to the conclusion that it only represents lease or loan payments.  It is only by reference to the IRM that courts have made that logical leap.  The plain meaning of "Ownership Costs," which is divided into two sub-categories of "First Car" and "Second Car," is those costs concomitant with owning a first and second vehicle.  As any vehicle owner can attest, the cost of ownership of a vehicle is much greater than one's lease or loan payments.  *See In re Ross-Tousey*, 549 F.3d at 1160.

Additionally, this interpretation of the statute is sensible given the sentence at the end of the statutory provision, which states as follows: "Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts."  § 707(b)(2)(A)(ii)(I).  If only those debtors who had secured debt payments on their vehicles were allowed to take the deduction, it would be incongruent with this statutory language.  *See In re Ross-Tousey*, 549 F.3d at 1158 (noting that "it is difficult to square this part of section 707(b)(2)(A)(ii)(I) with the IRM approach, which would only allow the vehicle ownership deduction on condition of a monthly debt payment.").  With the contemplation that a secured debt payment on a vehicle is meant to be *included* in "Ownership Costs," Form 22A requires those debtors who have secured debt payments on their first or second vehicle to reduce the deduction by the amount of

the secured debt payment on those vehicles.  The debtor then includes the secured debt

payment as a deduction under § 707(b)(2)(A)(iii).  The result is that the debtor will

deduct the higher of the Ownership Costs Deduction or their actual payments on secured

debt related to the vehicle during the life of the plan.  If only those debtors who had

secured debt payments were allowed to take the deduction, this roundabout method of

calculating the deduction would be nonsensical.

Finally, policy considerations also support this interpretation of the statutory

provision.  Denying this expense deduction to debtors who own their cars outright would

often lead to arbitrary and unfair results.  Many such debtors may own older vehicles that

may soon need to be replaced or may have delayed purchasing a new vehicle in order to

try to meet their debt obligations.  To disfavor such debtors is not a wise policy.  *See In

re Ross-Tousey*, 549 F.3d at 1161; *In re Ragle*, 395 B.R. at 399; *In re Pearson*, 390 B.R.

at 715 (Thurman, J., specially concurring) (noting that "as a matter of fairness, it makes

little sense to deny an ownership deduction to a frugal debtor who, although he has fully

paid for his used car, finds himself in need of bankruptcy relief, while allowing the

deduction to a more 'aggressive' debtor who has acquired a late model car by incurring a

large secured debt.").  Also, to allow the deduction favors the uniform application of the

Means Test, which was clearly meant to be more of a bright-line rule than an accurate

measure of ability to pay.  *In re Ragle*, 395 B.R. at 399-400.

It may seem that allowing the Ownership Costs deduction to debtors who own

their vehicles outright goes against one of the main policy goals of BAPCPA—that those

debtors "who can afford to repay some portion of their unsecured debts [be] required to

do so."  *In re Hardacre*, 338 B.R. 718, 725 (Bankr. N.D. Tex. 2006) (quoting 151 Cong.

Rec. S2470 (Mar. 10, 2005)).   However, most of the debtors who own a vehicle will need the extra disposable income regardless of whether they have lease or loan payments. In Florida, the exemption allowance for a vehicle is only $1,000.  Fla. Stat. § 222.25(1). Almost any car owned free and clear would have equity above that amount that is the property of the bankruptcy estate.  11 U.S.C. §§ 522, 541.  Debtors who own their vehicles free and clear would likely need to devote this "extra" disposable income to make payments to the trustee under a buyback arrangement in order to keep their vehicle.

Finally, as the Seventh Circuit has pointed out, the fact that a debtor passes the Means Test does not "insulate [the] case from dismissal.  Instead, it simply means that the debtor's petition is not presumed abusive."  *In re Ross-Tousey*, 549 F.3d at 1161; *see also In re Fowler*, 349 B.R. at 421.  The U.S. Trustee, as has occurred in this case, may still seek to dismiss a case under § 707(b)(3), even where a debtor passes the Means Test.

Therefore, for the reasons stated herein, the Court will allow these Debtors to take the Ownership Costs Deduction for their 1987 pickup truck, despite the fact that they make neither lease nor loan payments on the vehicle.

*Conclusion*

For the reasons stated herein, the Trustee's Motion for Summary Judgment is denied in full, and the Debtor's Motion for Summary Judgment is granted in part as to the issues relating to 11 U.S.C. § 707(b)(2).  As the Court indicated at the hearing on the Motions for Summary Judgment, the Court will schedule an evidentiary hearing on the remaining issue of whether this case should be dismissed as an abuse of Chapter 7 based on the totality of the circumstances, pursuant to § 707(b)(3).  Accordingly, it is

**ORDERED:**

1.    The United States Trustee's Motion for Summary Judgment (Doc. No. 27) is denied.

2.    The Debtor's Motion for Summary Judgment (Doc. No. 26) is granted in part as stated herein.

3.    A further pre-trial hearing will be scheduled for March 5, 2009, at 9:30 a.m., for the purposes of scheduling a final evidentiary hearing on the remaining issues in this contested matter.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on _____.

February 10, 2009

_____
Michael G. Williamson
United States Bankruptcy Judge

Copies to be provided by CM/ECF service.